J-S37034-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
MALIK HARRIS :
:
Appellant : No. 394 EDA 2023

Appeal from the Judgment of Sentence Entered September 6, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at CP-51-CR-0005107-2017

BEFORE: BENDER, P.J.E., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.: **FILED NOVEMBER 21, 2023**

Malik Harris (Appellant) appeals from the judgment of sentence imposed after a jury convicted him of aggravated assault and possession of an instrument of crime (PIC).[1]  After careful review, we affirm.

*Facts*

On May 13, 2017, Appellant was residing in a house located at 3435 F Street, Philadelphia, with the victim, David Smith (Smith), and Smith's family.  *See* N.T., 6/7/22, at 37, 61.  Smith's family included Smith's wife, Shana Derry (Derry), and their four children.  *Id.* at 37, 60-61.  Appellant rented a bedroom in the house.  *Id.* at 48.

---

[1] 18 Pa.C.S.A. §§ 2702(a), 907(a).

Smith testified at trial that he had known Appellant for over ten years. *Id.* at 42. However, Smith alleged he had no memory of events that occurred on May 13, 2017. *Id.* at 37-38. Accordingly, the Commonwealth refreshed Smith's recollection with a written police statement Smith had executed three days after the events, on May 16, 2017.[2] *See id.* at 38, 45-52.

In the statement, Smith told police he went to his home around noon on May 13, 2017, after receiving an urgent phone call from Derry. *Id.* at 46, 48. Derry had relayed that Appellant was at the house and engaged in a verbal altercation with Derry and her brother. *Id.* Upon entering the house, Smith encountered Appellant and Appellant's girlfriend in Appellant's second-story bedroom. *Id.* Smith told Appellant "he should probably find somewhere else to live." *Id.* at 46. Smith's statement enraged Appellant, who "snapped" and "sucker punched [Smith.]" *Id.* at 46-47. Appellant then pulled from his waist a .40 caliber handgun that belonged to Smith.[3] *Id.* at 49-50; *see also id.* at 47.

A physical struggle ensued. *Id.* at 47; *see also id.* (Smith stating in the police statement that he "pushed the slide back on the gun so [Appellant] couldn't shoot me"). During the struggle, Appellant and Smith fell down the

---

[2] Smith testified on cross-examination that he did not recognize his signature or handwriting on the police statement. N.T., 6/7/22, at 58-59.

[3] Smith told police he was unaware Appellant had his gun and had never given Appellant permission to possess it. N.T., 6/7/22, at 50.

stairs and a bullet ejected from the gun. *Id.*; *see also id.* (Smith telling police, "I don't know if [the bullet] hit anyone."). When Smith and Appellant "hit the bottom" of the stairs, Appellant and his girlfriend "were beating on [Smith]." *Id.* Appellant "pull[ed Smith] outside" to the porch, where the men continued "wrestling with the gun." *Id.* Smith stated that Appellant eventually "got the gun from me." *Id.* Appellant then opened fire on Smith while Smith was heading back toward the front door of the house.[4] *Id.* Smith "tried running up the steps" as Appellant continued firing. *Id.* at 47-48; *see also id.* at 48 (Smith stating he saw "bullets actually hitting" the open front door). Thereafter, emergency responders arrived and transported Smith to a hospital, where he underwent emergency surgery and was treated for seven gunshot wounds. *Id.* at 65-66.

During Smith's trial testimony, the Commonwealth played a video that was recorded on May 13, 2017, from a security camera on a neighboring property. *Id.* at 52-53. Smith confirmed that one of the individuals in the video "[l]ooks like myself." *Id.* However, Smith claimed not to recognize anyone else in the video, and had no recollection of events depicted in the video. *Id.* at 54.

Derry testified that on May 13, 2017, she was in the house with her children. *Id.* at 62. Derry heard Smith and Appellant "arguing" and "fighting"

---

[4] Smith and Derry's children were in the house when Appellant began shooting. N.T., 6/7/22, at 21, 23, 47, 63.

in Appellant's bedroom. *Id.* at 63. Derry confirmed that as the confrontation escalated, Appellant "pushed [Smith] outside on the porch[.]" *Id.* Derry heard gunfire, but stated she "wasn't … outside when [the shooting] happened" and did not see Smith get shot. *Id.* at 63; *see also id.* at 64. Derry called the police. *Id.* at 66.

Philadelphia Police Officer Daniel Martinez testified he was patrolling near the house in his marked vehicle when he received a radio dispatch to respond to the shooting. *Id.* at 18-19. Upon arriving at the house, Officer Martinez saw Smith lying in a pool of blood. *Id.* at 20. Officer Martinez asked Smith who shot him, and Smith identified Appellant as the shooter; Smith described Appellant and the clothing he was wearing. *Id.* at 21-22. Officer Martinez relayed the information to dispatch, which issued a flash broadcast about the suspect. *Id.* at 22.

Philadelphia Police Detective Thomas Somogyi (Detective Somogyi) testified that he was the lead investigator assigned to Smith's shooting. *Id.* at 76-77. Detective Somogyi interviewed Smith at the hospital three days after the shooting. *Id.* at 84-85. Detective Somogyi confirmed that he transcribed the statement Smith gave from his hospital bed. *Id.* at 91-92. Detective Somogyi testified that he provided Smith with the opportunity to read the transcribed statement, and Smith "signed after every page." *Id.* at 92. Detective Somogyi also asked Smith whether he wished to make any modifications or changes to the statement, and Smith declined. *Id.* at 92-93.

Detective Somogyi read Smith's police statement aloud for the jury. *Id.* at 93-97.

Detective Somogyi also testified about executing a search warrant at the house. *Id.* at 79-82, 97. During the search, police recovered a box of .40 caliber ammunition. *Id.* at 82. Police never recovered the handgun. *Id.* at 97.

Detective Somogyi explained that shortly after the shooting, police "developed [Appellant] as a suspect." *Id.* Detective Somogyi learned that Appellant was being treated for injuries at a local hospital emergency room. *Id.* Detective Somogyi went to the hospital on the date of the shooting, and discovered Appellant was being treated for a gunshot wound to his leg.[5] *Id.* at 98.

The Commonwealth also presented testimony from Ivan Pagan (Pagan). Pagan testified that at the time of the shooting, he was riding in the front passenger seat of a car that was driving on F Street. N.T., 6/8/22, at 3-4. Pagan saw two men arguing. *Id.* at 4. He described one of the men as "light-skinned" and possibly Hispanic, and the other man as "very big" and "dark-skinned." *Id.* at 4, 5. The Commonwealth asked Pagan the following questions:

---

[5] The parties stipulated that Appellant suffered a single gunshot wound on May 13, 2017, received treatment at a hospital emergency room, and was discharged the same day. N.T., 6/8/22, at 51.

Q. [Prosecutor:] When you saw [the two men] fighting, what did you see?

A. [Pagan:] Originally I ended up seeing one of them holding the gun. The light-skinned one was trying to take it from the[] [other man]. They ended up on the porch and continued the argument hassling over the firearm. The Hispanic guy tried to lock[] himself in the house and that's when the shots were fired.

Q. Who fired the shots?

A. The dark-skinned guy.

Q. Did you ever see the person you're describing as the light-skinned guy with the gun?

A. No.

Q. Do you know either of those people?

A. No.

*Id.* at 5.

Pagan further testified that the shooter "ran to somebody's porch and put a hoodie on." *Id.* at 6; *see also id.* at 7 (Pagan stating Appellant "put a hoodie on that one of his friends … was giving him."). The prosecutor asked Pagan to "look around the courtroom today. Do you recognize anybody that you saw that day?" *Id.* at 7. Pagan replied, "Not really. I would not be able to recall." *Id.* The prosecutor reminded Pagan that on the day of the shooting, Pagan went to the police station and was presented with a photo array that included a picture of Appellant. *Id.* at 7-8, 10; *see also id.* at 8 (Pagan affirming his police statement could "[p]ossibly" refresh his purportedly faulty recollection). In his police statement, Pagan identified

- 6 -

Appellant as the shooter from the photo array.  N.T., 6/8/22, at 18-19, 23; *see also id.* at 18 (testimony from police detective who presented the photo array stating that Pagan selected Appellant's photo from the six photos presented).  On cross-examination, Appellant's trial counsel impeached Pagan with his past convictions for, *inter alia*, theft and PIC.  *Id.* at 14-15.

Appellant was the only defense witness.  Appellant testified in a manner consistent with his claim that he shot Smith in self-defense.  Appellant stated that when Smith arrived at the house, he went to Appellant's bedroom and expressed displeasure with the dispute between Appellant and Derry.  N.T., 6/8/22, at 67.  According to Appellant, Smith asked him to leave the house, and "the argument started getting a little hostile."  *Id.* at 67, 68.  Appellant testified that Smith

> started stepping closer toward me and then started pushing me. It was a shoving match.  He swings and I swing and we start fighting in the room.  As I pushed [Smith] against the wall he pulls his gun from his waist and shoots my leg.  I'm so close to [Smith] and when I went to grab my leg the gun is still right there, so I grabbed the gun and tried to wrestle the gun from [Smith,] being afraid of being shot again.  We tussle over the gun into the hallway all the way to the top of the steps.  As I'm walking backwards down the steps trying to pull the gun from him we wound up tripping down the steps.  The gun falls and [Smith] grabs it and then I grab it.  All I was trying to do was protect myself to survive[,] is the only thing going through my mind.  As I go through the door trying to get the door open[,] I pull [Smith] back out of the house and we tumble down the steps and onto the car and then I finally got ahold of the gun.

*Id.* at 68-69.

Appellant estimated he fired "[t]hree, maybe more" shots at Smith. *Id.* at 74. Appellant stated he "wasn't thinking" when he fired the gun; rather, he was "[j]ust trying to survive." *Id.* Appellant testified that he dropped the gun as he was running away. *Id.* Trial counsel asked Appellant: "If [Smith] hadn't produced a firearm, would this have ever gone beyond a fistfight?" *Id.* at 79-80. Appellant responded: "With me, no. … I just know I would have packed my things and left." *Id.* at 80.

On cross-examination, the prosecutor questioned Appellant about statements he made to police when he was at the hospital emergency room shortly after the shooting.[6] *Id.* at 80. The prosecutor asked: "You never say … that [Smith] wanted to kill you, am I correct?" *Id.* Appellant conceded the prosecutor was correct. *Id.* at 80-81.

Appellant also denied changing his clothes or putting on a hoodie before going to the hospital. *Id.* at 82-83. Referencing the video recording, the prosecutor asked Appellant:

Q. That door opening right there, that's the house you lived in at [3435] F Street?

A. Yes.

Q. That person in the white shirt is you, correct?

A. Yes.

Q. That person is [Smith] whose back is to the door, correct?

---

[6] Appellant confirmed the police had advised him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). N.T., 6/8/22, at 77.

A. Yes.

Q. You would agree with me [at] the timestamp of 12:14:29[,] you have sole possession of the gun, correct?

A. Right there, yes.

Q. [Smith] does not have a handgun at this point?

A. No.

Q. [Smith] has no weapons?

A. No.

Q. You would agree with me at 12:14:31[, Smith] turned his back to you to walk inside the house, correct?

A. Yeah.  He walked backwards.  He didn't turn around and run.

Q. And now [Smith is depicted] walking into the house.  Would you agree with me?

A. Yes.

* * *

Q. And you're holding a gun?

A. Yes.

Q. You agree with me that's you shooting [Smith]?

A. Yes.

Q. That's you shooting him again?

A. Yes.

*Id.* at 83-85.

On re-direct, trial counsel asked Appellant if he tried to take the handgun away from Smith. *Id.* at 89. Appellant replied that he bit Smith on the hand in an attempt to disarm him. *Id.* Appellant also testified that Smith threatened to kill Appellant during the scuffle outside the house. *Id.* at 90; *but see also id.* (Appellant confirming he had **sole possession** of the firearm when Smith made death threats).

On re-cross-examination, the prosecutor asked Appellant: "When you were standing outside on the sidewalk and you had control of the gun[,] you could have left, correct?" *Id.* at 97. **Appellant responded: "I don't know."** *Id.* (emphasis added).

*Procedural History*

Shortly after the shooting, in May 2017, the Commonwealth charged Appellant with aggravated assault and PIC, as well as attempted murder, firearms not to be carried without a license, and carrying firearms in Philadelphia (remaining offenses).[7] As noted above, the case did not go to trial until 2022.[8]

_____

[7] 18 Pa.C.S.A. §§ 901(a), 2502, 6106(a)(1), 6108.

[8] Appellant was released from pre-trial incarceration in November 2018, pursuant to Pa.R.Crim.P. 600 (governing speedy trial rights). N.T., 9/6/22 (sentencing), at 17. A bench warrant was issued for Appellant's arrest on June 24, 2019, when he failed to appear for court. *Id.* Police arrested Appellant on new charges arising from an incident that occurred on February 25, 2021. *Id.*

On June 9, 2022, the jury found Appellant guilty of aggravated assault and PIC, but acquitted him of the remaining offenses. The trial court deferred sentencing for the preparation of a pre-sentence investigation (PSI) report.

The trial court held a sentencing hearing on September 6, 2022. Appellant requested a standard-guidelines-range sentence. *Id.* at 12; *see also id.* at 9-14 (trial counsel arguing Appellant's criminal conduct was "aberrant," and emphasizing mitigating factors such as Appellant's difficult childhood, and Appellant's prior record score (PRS) of zero). The Commonwealth asked the trial court to impose "a significant period of state incarceration." *Id.* at 14-15. Appellant exercised his right of allocution and expressed a degree of accountability for the shooting. *Id.* at 23-26. The trial court also heard testimony from Appellant's mother, Ebony Harris, who spoke on Appellant's behalf. *Id.* at 18-23.

The trial court sentenced Appellant to an aggravated range 6½ - 13 years in prison for aggravated assault, and a consecutive five years of probation for PIC. *Id.* at 34. Appellant timely filed a post-sentence motion (PSM). Appellant claimed the verdicts were against the weight of the evidence and the trial court abused its discretion by imposing an unreasonably excessive sentence. PSM, 9/15/22, ¶¶ 5-8. The trial court did not hold a hearing on the PSM, and it was denied by operation of law on January 4, 2023. *See* Pa.R.Crim.P. 720(B)(3)(a) (stating: "If the judge fails to decide [a post-sentence] motion within 120 days, or to grant an extension as provided in

paragraph (B)(3)(b), the motion shall be deemed denied by operation of law.").

On February 3, 2023, trial counsel filed a notice of appeal as well as a motion to withdraw as Appellant's counsel.[9] The trial court granted the motion to withdraw and appointed new counsel (who represents Appellant in this appeal). Thereafter, the judge who sat as the trial court was transferred to the Civil Division of the Philadelphia Court of Common Pleas, and did not order Appellant to file a Pa.R.A.P. 1925(b) concise statement or issue trial court opinion.[10]

Appellant presents the following questions for review:

A. Was the evidence insufficient to sustain the guilty verdicts for aggravated assault and PIC, as the Commonwealth failed to disprove beyond a reasonable doubt the Appellant's claim of self-defense, where the complainant was the initial aggressor who then escalated the incident when he shot the Appellant, which then led to a life-struggle over the firearm in which the Appellant had no choice to but [*sic*] shoot [Smith] with that same firearm. Additionally, Appellant was in his own residence, had no duty to retreat, but did nonetheless leave for safety?

_____

[9] Trial counsel explained that Appellant had not retained him for the appeal. Motion to Withdraw, 2/13/23, ¶ 4.

[10] The lack of a trial court opinion has complicated our review. Nonetheless, we decline to remand. *See*, *e.g.*, *Commonwealth v. Baker*, 72 A.3d 652, 662 n.9 (Pa. Super. 2013) (stating that "in the interest of judicial economy, we need not remand the case for the trial court to" file an opinion addressing appellant's discretionary sentencing claim); *Commonwealth v. Hood*, 872 A.2d 175, 178 (Pa. Super. 2005) (holding that although the "Rules of Appellate Procedure make the filing of a 1925(a) opinion mandatory," the "lack of a Rule 1925(a) opinion is not always fatal to our review, because we can look to the record to ascertain the reasons for the order.").

B. Were the guilty verdicts for aggravated assault and PIC against the weight of the evidence, as the evidence was that Appellant was the victim of an assault and used justified force against his assailant?

C. Did the sentencing court abuse discretionary aspects of sentencing by entering an excessive sentence that was more than necessary to protect the public, vindicate the victim, rehabilitate the Appellant and did not adequately consider the Appellant's great remorse?

Appellant's Brief at 5 (reordered).

*Sufficiency*

Appellant asserts the Commonwealth failed to present sufficient evidence for the jury to convict him of aggravated assault and PIC. ***See id.*** at 25-27. According to Appellant, the Commonwealth failed to meet its burden of disproving his claim that he shot Smith in self-defense. ***Id.*** at 26. Appellants states, "because Appellant acted in justified self-defense, the intent element for aggravated assault and PIC were [*sic*] not proven." ***Id.***

The Commonwealth counters that it disproved Appellant's claim of self-defense and presented evidence of the elements of aggravated assault and PIC beyond a reasonable doubt. ***See*** Commonwealth Brief at 14-16. According to the Commonwealth,

the evidence established [Appellant] initiated the violence, first with his fists and then by throwing [Smith] onto a glass table. It was [Appellant] who then pulled out a gun and introduced it into the affray. [Appellant] was the only person in possession of a deadly weapon when he shot the unarmed [victim] seven times as he was trying to flee back into his house to escape [Appellant's] gunfire. [Appellant] continued to shoot into the house even after [Smith] entered it, despite [Appellant's] knowledge that children were present inside. Once [Appellant] gained control of the only

- 13 -

firearm on the premises, and especially once Mr. Smith began to move away from [Appellant] and towards the house, [Appellant] could have had no conceivable belief, reasonable or not, that he was in imminent danger or that he was justified in firing seven shots at Mr. Smith.

*Id.* at 16 (citations omitted).

We evaluate Appellant's sufficiency claim mindful of the following:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Jones*, 271 A.3d 452, 458 (Pa. Super. 2021) (citations and ellipses omitted).

With respect to aggravated assault, the Crimes Code provides,

A person is guilty of aggravated assault if he:

(1)   attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

(2)   attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c) or to an employee of an agency, company or other entity

- 14 -

> engaged in public transportation, while in the performance of duty….

18 Pa.C.S.A. § 2702(a)(1), (2).[11]

"Serious Bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 2301. The Commonwealth may establish intent to cause serious bodily injury by circumstantial evidence, and a jury "may infer intent from attendant circumstances or the defendant's acts or conduct." ***Commonwealth v. Holley***, 945 A.2d 241, 247 (Pa. Super. 2008) (citation omitted). A jury may infer intent to cause serious bodily injury when the defendant fires a gun. ***Commonwealth v. Matthews***, 870 A.2d 924, 929 (Pa. Super. 2005) (*en banc*).

As to PIC, a "person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. § 907(a); ***see also id.*** § 907(d) (defining "instrument of crime").

Use of force is justified "when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force" by the other person. ***See*** 18 Pa.C.S.A. § 505(a); ***see also id.*** § 501 (defining unlawful force). When a defendant employs deadly force,

---

[11] The Commonwealth charged Appellant under Section 2702(a) generally, which includes multiple subsections. 18 Pa.C.S.A. § 2702(a)(1)-(9). It is undisputed that 2702(a)(1) and (2) are the pertinent subsections in this case.

the elements of a claim of self-defense are that the defendant (1) "reasonably believed" deadly force was necessary to protect against "death or serious bodily injury"; (2) was "free from fault in provoking" the use of force against him; and (3) "did not violate any duty to retreat." *Commonwealth v. Mouzon*, 53 A.3d 738, 740 (Pa. 2012) (citation omitted). The Commonwealth has the burden of disproving a claim of self-defense beyond a reasonable doubt by establishing that at least one of the three above-mentioned elements is absent. *Commonwealth v. Sepulveda*, 618 Pa. 262, 55 A.3d 1108, 1124 (Pa. 2012).

This Court has stated:

[T]he use of deadly force itself cannot be viewed in isolation with the victim as the sole physical aggressor and [the defendant] acting in responsive self-defense. [T]his would be an incomplete and inaccurate view of the circumstances for self-defense purposes. To claim self-defense, the defendant must be free from fault in provoking or escalating the altercation that led to the offense, before the defendant can be excused from using deadly force. Likewise, the Commonwealth can negate a self-defense claim by proving the defendant "used more force than reasonably necessary to protect against death or serious bodily injury."

*Commonwealth v. Smith*, 97 A.3d 782, 787 (Pa. Super. 2014) (citations, emphasis, brackets and some quotation marks omitted).

When the defendant's own testimony is the only evidence of self-defense, the Commonwealth must still disprove the asserted justification and cannot simply rely on the jury's disbelief of the defendant's testimony…. If there are other witnesses, however, who provide accounts of the material facts, it is up to the fact finder to reject or accept all, part or none of the testimony of any witness. The [victim] can serve as a witness to the incident to refute a self-defense claim. **Although the Commonwealth is required to disprove a claim of self-defense arising from**

- 16 -

> **any source beyond a reasonable doubt, a jury is not required to believe the testimony of the defendant who raises the claim.**

*Id.* at 788 (emphasis added; citations and quotation marks omitted); *see also Jones*, 271 A.3d at 458 ("The finder of fact is not required to believe the defendant's testimony that he thought that he was in imminent danger and acted in self-defense.").

Instantly, we underscore Smith's testimony and transcribed statement he gave police from his hospital bed three days after the shooting. *See* N.T., 6/7/22, at 45-51; *see also id.* at 24 (Smith repeatedly testifying he could not remember the events of May 13, 2017), and *id.* at 56 (Smith stating he did not want to testify and was appearing due to a prosecution subpoena). Smith confirmed he gave a police statement indicating the dispute with Appellant began when Derry called Smith and relayed that Appellant was at the house arguing with Derry and her brother. *Id.* at 46, 48. Smith went home and confronted Appellant. *Id.* at 48-49; *see also id.* at 46. Smith engaged in a verbal dispute with Appellant, and told Appellant "he should probably find somewhere else to live." *Id.* at 46; *see also id.* at 48 (Smith confirming the dispute became physical when Smith "told [Appellant] to go."). Smith stated that Appellant became enraged and "snapped out on [Smith] and [] sucker punched" Smith. *Id.* at 46-47.

Smith also confirmed his police statement which described the altercation:

[Appellant] kept punching me and shoving me. We were in [Appellant's] room and he tried to throw me on the glass table. I was able to find my bearings and next thing I knew pulled out my gun. I got up as fast as I could and pushed the slide back on the gun so [Appellant] couldn't shoot me.

* * *

We started tussling [with] the gun and I heard the bang. I don't know if it hit anyone. I actually thought I was shot. Then [Appellant] and his [paramour] tried to push me down the steps. When I started falling I grabbed [Appellant] and pulled him down with me. When we hit the bottom[, Appellant] and his [paramour] were beating on me. My wife and kids were right there. When [Appellant] started pulling me outside his [paramour] walked off. We were still wrestling for the gun when we were going outside. My hip was killing me from the fall and [Appellant] got the gun from me.

* * *

All I remember is [Appellant] pointing the gun at me and saying "you want to shoot me, motherfucker!" and he started [firing the gun at] me. That was down on the sidewalk. When I tried running up the steps[, Appellant] hit me like four times. When I finally got back to the door[, Appellant] was still shooting me. I remember bullets actually hitting the door. I was laying on the floor bleeding and I asked [Derry] for water and a pillow. I told [Derry] and her friends to call 9-1-1. I told [Derry] I loved her and my kids.

**Id.** at 46-48.

At the close of evidence, the trial court instructed the jury on numerous topics, including self-defense and the Commonwealth's burden to disprove the claim, **id.** at 27-32, as well as the elements of the charged crimes. **Id.** at 18-27. During deliberations, the jury notified the trial court it had two questions, both relating to self-defense. **Id.** at 38. The trial court answered the questions as agreed by the parties. **Id.** at 38-47.

- 18 -

The above facts are analogous to the facts presented in *Commonwealth v. Yanoff*, 690 A.2d 260 (Pa. Super. 1997). In *Yanoff*, the appellant raised a sufficiency challenge to his jury convictions of third-degree murder and aggravated assault. *Id.* at 264. On August 2, 1994, the victim and appellant had spent the day fishing. *Id.* at 262. This Court explained:

> Appellant and the victim began to proceed back to [the b]ridge [at which they had been fishing]. On the way, the victim directed appellant to navigate down a narrow wooded lane and park the car. Appellant [testified at trial and] claimed that he parked the car and, as he was turning off the engine, the victim began to strike him. Appellant stated that he exited the car and was pursued by the victim. Appellant warned the victim that he had a pistol. Appellant testified that the victim responded that he was not afraid of firearms. Appellant then fired four rounds from the weapon in the opposite direction from the victim's voice.
>
> Appellant testified that the victim then tackled him from behind and began hitting him in the back of the neck with a can of beer. According to Appellant, the victim began biting him on the ear and face, including his nose. They both struggled over the gun. The victim stood up and stated that he was going to smash appellant's face with a rock and kill him. The victim then attempted to run away from Appellant. Appellant pointed the gun toward the victim and fired four rounds into his back.

*Id.* at 263 (some capitalization modified; break omitted).

The appellant drove the victim to a hospital, where the victim died from the gunshot wounds. *Id.* Pennsylvania State Police Trooper Mark Ponosby interviewed appellant at the hospital. *Id.* Appellant waived his *Miranda* rights and informed Trooper Ponosby

> that the victim was approximately fifteen to twenty feet away when he fired the gun, that he saw the victim fall down after these shots were fired, and that appellant was in close proximity to his car when he shot the victim.

- 19 -

*Id.*

On appeal, the appellant argued his convictions were not supported by sufficient evidence because the Commonwealth failed to disprove his claim of self-defense. *Id.* at 264; *see also id.* ("[a]ppellant states that he received multiple abrasions and bite marks on his face and body which indicated a struggle with the victim."). In rejecting this argument, we explained:

> [Trooper] Ponosby testified that appellant told him the victim was fifteen to twenty feet away from him when he fired the shots. In addition, [Trooper] Ponosby testified that appellant stated **the victim was not running toward him but, rather, was running away from [appellant] as he fired his gun.** Finally, Ponosby testified that at all times during the struggle and the discharge of the weapon, appellant was near his car.
>
> The Supreme Court has held that before deadly force may be used in self-defense, outside a defendant's dwelling, the defendant has a duty to retreat, if the retreat can be performed safely. *Commonwealth v. Commander*, 260 A.2d 773, 778 (Pa. 1970). In the present case, **the evidence supports a conclusion that appellant could have retreated to his car while the victim was running away from him, and that he could have made this retreat in complete safety**. The duty to retreat clearly applied, given the facts of this case. If appellant had entered his car and began to flee, the victim, even if armed with a rock, could not have posed a substantial threat to appellant's life to justify the use of deadly force.
>
> The fact that appellant shot the victim in the back clearly undermines his claim of self-defense. In a case dealing with self-defense within a residence, we have concluded that **where a defendant has sole possession of a deadly weapon and inflicts fatal blows upon the victim's back, a claim of self-defense will necessarily fail.** *Commonwealth v. Gelber*, 594 A.2d 672, 677 (Pa. Super. 1991), *allocatur denied*, 605 A.2d 332 (Pa. 1992) (where appellant stabbed victim twenty times, including fourteen times in the back, inflicted from behind, [holding appellant's] claim of self-defense lacked merit). Thus,

we hold, upon viewing the evidence in the light most favorable to the Commonwealth, that because the car was near appellant and the victim was running away from appellant when appellant shot him in the back, appellant's argument that the Commonwealth failed to disprove his claim that the killing was in self-defense lacks merit.

**Yanoff**, 690 A.2d at 264-65 (emphasis added; citation and some capitalization modified).

Applying **Yanoff**, and viewing the evidence of Smith's shooting in the light most favorable to the Commonwealth, we conclude the Commonwealth (1) presented sufficient evidence to prove all elements of aggravated assault and PIC beyond a reasonable doubt; and (2) met its burden of disproving Appellant's justification defense beyond a reasonable doubt. **See Yanoff**, **supra**; **Commonwealth v. Bullock**, 948 A.2d 818, 824 (Pa. Super. 2008) (finding evidence sufficient to disprove defendant's self-defense claim where the jury could reasonably conclude defendant was not acting in self-defense when he shot the unarmed victim in the back while the victim was running from defendant); **see also Commonwealth v. Hall**, 830 A.2d 537, 542-43 (Pa. 2003) (upholding appellant's aggravated assault conviction where jury rejected appellant's testimony that the shooting was accidental, and circumstantial evidence was adequate to prove appellant discharged a gun in the direction of the victim).

The jury was free to disregard Appellant's version of events, including his claim that he acted in self-defense. **Jones**, **supra** (fact-finders are free to believe all, part or none of the evidence). The jury chose to believe the

Commonwealth's evidence that Appellant introduced deadly force into the altercation and shot Smith, who was unarmed, several times while Smith attempted to return to the house. Appellant could have de-escalated the conflict when he and Smith were outside, and he could have retreated from the conflict. Instead, he shot Smith seven times as Smith retreated. Also, Appellant's flight and changing of clothes supports an inference of consciousness of guilt.[12] *See Commonwealth v. Perez*, 220 A.3d 1069, 1078 (Pa. Super. 2019) (*en banc*) (flight and concealment may constitute circumstantial proof of consciousness of guilt). Accordingly, Appellant's first issue lacks merit.

*Weight*

Appellant next claims the trial court abused its discretion in denying his PSM challenging the weight of the evidence. *See* Appellant's Brief at 18-25.

To prevail on this challenge, Appellant must establish that the evidence supporting his conviction is "so tenuous, vague, and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Smith*, 146 A.3d 257, 265 (Pa. Super. 2016) (citation omitted); *see also Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (reversal is only appropriate "where the facts and inferences disclose a palpable abuse of discretion") (citation omitted). "One of the least assailable reasons for granting or denying a new

---

[12] The trial court instructed the jury on consciousness of guilt. N.T., 6/9/22, at 32-33.

trial is the lower court's conviction that the verdict was or was not against the weight of evidence…." ***Commonwealth v. Morales***, 91 A.3d 80, 91 (Pa. 2014) (emphasis omitted). "The weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, none, or some of the evidence and to determine the credibility of the witnesses." ***Commonwealth v. Talbert***, 129 A.3d 536, 545 (Pa. Super. 2015) (citation omitted). "A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." ***Commonwealth v. Lewis***, 911 A.2d 558, 566 (Pa. Super. 2006) (citation omitted).

We first address, *sua sponte,* whether Appellant's weight claim is reviewable, as the trial court never addressed the claim, and Appellant's PSM was denied by operation of law. This Court confronted this same scenario in ***Commonwealth v. Upshur***, 764 A.2d 69 (Pa. Super. 2000) (*en banc*):

> After trial, appellant filed timely post-sentence motions which included the issue of whether the verdict was against the weight of the evidence. At this juncture, however, the trial judge was no longer sitting as a judge and the post-trial motions were denied by operation of law. Consequently, the trial judge never addressed the weight claim presented by appellant. However, to find this claim unreviewable, as the Commonwealth suggests, would be unjust to appellant in that he has taken all measures necessary to properly preserve this claim for our consideration. Moreover, **when a claim is denied by operation of law, the effect of the denial operates in the same manner as if the court had denied the motion itself**. Accordingly, we find that for these reasons, in conjunction with the fact that **this was a jury trial and all credibility determinations have been made by the jury and not by the trial judge**, we are not precluded from addressing appellant's weight claim. ***See Commonwealth v. Cannon***, … 563 A.2d 918, 923-24 (Pa. Super. 1989) (holding that post-trial motions for new trial and/or in arrest

- 23 -

of judgment could be decided by judge other than trial judge where trial judge was relieved of his duties so as to prevent him from making determination on legal issues raised by defendants, and where there was a jury trial such that all issues of credibility and reasonable doubt were resolved by the jury).

*Id.* at 73 (emphasis added; footnote omitted; some capitalization modified).

*Upshur* is on-point. *Id.* Thus, we address the merits of Appellant's weight claim.

Appellant argues "the guilty verdicts were against the weight of the evidence[,] as Appellant's use of force was justifiable and the Commonwealth did not successfully disprove this beyond a reasonable doubt." Appellant's Brief at 22. Appellant claims the "Commonwealth witnesses were biased and essentially covered up for" Smith, who, Appellant submits, "was the initial and ongoing aggressor…." *Id.* According to Appellant, Smith's "testimony was highly unreliable." *Id.* at 23 (citation omitted); *see also id.* at 24 (stating Smith "did not recall material parts from the events of May 13, 2017"). Appellant further states, "Derry did not see the actual shooting, and is naturally biased in her husband's favor." *Id.* (citation omitted).

The Commonwealth argues the trial court did not abuse its discretion. *See* Commonwealth Brief at 11-14. According to the Commonwealth, Appellant's

weight claim is based on an implicit assertion that it was shocking that the trial judge did not credit [Appellant's] weight claim and his testimony. But such weighing of the evidence and deciding which version of events to believe was a routine task that was solely within the purview of the jury: "a jury is not required to believe the testimony of the defendant who raises [a self-defense]

- 24 -

claim." ***Commonwealth v. Houser***, 18 A.3d 1128, 1135[] ([Pa.] 2011) [(citation omitted).]

Commonwealth Brief at 12; ***see also id.*** at 14 (although Appellant "quibbles with the alleged 'bias' of [Smith] and [Derry,] … [witness credibility] was … solely for the jury to decide.").

A jury is generally "free to believe some, all, or none of the Commonwealth's evidence" and "free to resolve inconsistencies or discrepancies in the testimony in either party's favor." ***Commonwealth v. Jacoby***, 170 A.3d 1065, 1078 (Pa. 2017). Appellant improperly asks us to substitute our judgment for that of the jury, and reassess the evidence and credibility of the witnesses. ***See Commonwealth v. Koehler***, 229 A.3d 915, 937 (Pa. 2020) (stating appellate courts are "not equipped to receive evidence, assess that evidence, or make credibility determinations."); ***Commonwealth v. West***, 937 A.2d 516, 523 (Pa. Super. 2007) (emphasizing the factfinder is "free to believe all, part or none of the evidence," and appellate courts will not re-weigh evidence or substitute our judgment for that of the factfinder (citation omitted)).

Lastly, it bears repeating that the jury acquitted Appellant of the remaining charges, including the most serious charge of attempted murder. Our review reveals no merit to Appellant's challenge to the weight of the evidence. ***See Houser***, 18 A.3d at 1136 (stating, "By virtue of the verdict, it is clear the jury did not find appellant's self-serving self-defense testimony credible.").

*Discretionary Aspects of Sentencing*

In his final issue, Appellant claims the trial court imposed an unreasonably excessive sentence, and failed to adequately consider mitigating factors. *See* Appellant's Brief at 12-18. Appellant challenges the discretionary aspects of his sentence, from which there is no absolute right to appeal. *Commonwealth v. Summers*, 245 A.3d 686, 691 (Pa. Super. 2021). When an appellant has preserved his discretionary sentencing claim by raising it in a timely PSM,

> [t]wo requirements must be met before we will review [the challenge] on its merits. First, [pursuant to Pa.R.A.P. 2119(f),] an appellant must set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence. Second, the appellant must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code. That is, that the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process. We examine an appellant's Pa.R.A.P. 2119(f) statement to determine whether a substantial question exists.

*Commonwealth v. Hill*, 66 A.3d 359, 363-64 (Pa. Super. 2013) (brackets and some citations omitted).

Appellant has provided a Rule 2119(f) statement. Appellant's Brief at 12-14. Further, he presents a substantial question. *See Commonwealth v. Knox*, 165 A.3d 925, 929-30 (Pa. Super. 2017) ("A claim that the trial court focused exclusively on the seriousness of the crime while ignoring other, mitigating circumstances, such as [the defendant's] mental health history and difficult childhood, raises a substantial question."); *Commonwealth v.*

*Moury*, 992 A.2d 162, 171 (Pa. Super. 2010) (a substantial question is raised when an appellant alleges the sentencing court imposed a sentence in the aggravated range without adequately considering mitigating circumstances).

We review the merits of Appellant's claim mindful that sentencing "is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Barnes*, 167 A.3d 110, 122 n.9 (Pa. Super. 2017) (*en banc*) (citation omitted); *but see also Yanoff*, 690 A.2d at 267 ("while sentencing courts are given wide latitude … such discretion is not unfettered."). This Court has explained:

> The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it.

*Moury*, 992 A.2d at 170 (citation omitted).

In addition, the Pennsylvania Supreme Court has emphasized that trial courts

> sentence[] flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed.

*Commonwealth v. Pasture*, 107 A.3d 21, 27 (Pa. 2014) (citations and quotation marks omitted).

The Sentencing Code states that a sentence "should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b). A "sentencing court has broad discretion in choosing the range of permissible confinements that best suit a particular defendant and the circumstances surrounding his crime." *Hill*, 66 A.3d at 370 (citation omitted). The court "need not undertake a lengthy discourse for its reasons for imposing a sentence or specifically reference the statute in question, but the record as a whole must reflect the sentencing court's consideration of the facts of the crime and character of the offender." *Commonwealth v. Schutzues*, 54 A.3d 86, 99 (Pa. Super. 2012) (citation omitted).

Appellant claims the trial court abused its discretion by imposing an aggravated-range sentence that failed to account for mitigating circumstances. *See* Appellant's Brief at 15-18. According to Appellant, his sentence is

> excessive, [and] more than necessary to protect the public and vindicate [Smith], because Appellant had a PRS of "0" and enjoys familial and community support. Additionally, the excessive sentence failed to consider that Appellant suffered greatly as a child due to a broken family and periods of homelessness.

*Id.* at 17 (citation omitted); *see also id.* at 18 (asserting the sentencing court disregarded that Appellant "is the true victim and he was essentially convicted for … [using] justified force in his defense."). Appellant also claims his

sentence "was more than necessary to address rehabilitative needs and Appellant's potential for rehabilitation." *Id.* at 17. Appellant further references his remorse. *Id.* at 18. Thus, Appellant maintains the trial court should have sentenced him in the mitigated range of the guidelines. *Id.*

To the contrary, the Commonwealth argues the trial court acted properly and within its discretion. The Commonwealth states,

> [Appellant] points repeatedly to his [PRS] of zero as evidence that somehow alone proves his sentence was excessive. Brief for Appellant [at] 17. However, and as the trial court recognized, [Appellant's] formal [PRS] was misleading because it did not reflect his numerous arrests and probationary placements as a juvenile and adult. It is well settled that "a court may consider a defendant's prior arrests which did not result in convictions, as long as the court recognizes the defendant has not been convicted of the charges." *Commonwealth v. Johnson*, 481 A.2d 1212, 1214 (Pa. Super. 1984). As such, the [sentencing] court did not abuse its discretion by fully accounting for [Appellant's] criminal history at sentencing, while explicitly acknowledging that none of the charges had led to formal convictions.

Commonwealth Brief at 8 (footnote omitted).

At sentencing, the trial court stated it had considered the PSI, as well as "the defense's sentencing documents, including several letters from people who know [Appellant], and are speaking in support of him in their letters." N.T., 9/6/22, at 3. The trial court confirmed Appellant's PRS was zero. *Id.* at 3-4. Further, the trial court stated it had considered the applicable sentencing "guideline calculation." *Id.* at 5.

The trial court also heard extensive argument from trial counsel, who submitted that Appellant shooting Smith was "aberrant," and emphasized that

Appellant was also shot during the altercation. *Id.* at 7-9. Trial counsel referenced mitigating information in the PSI, including Appellant's difficult childhood. *Id.* at 9. Trial counsel further emphasized that Smith was the owner of the gun involved in the fray. *Id.* at 11-12. Trial counsel concluded, "I would ask the [c]ourt to consider that in this case a standard-range sentence would be appropriate." *Id.* at 12.

The trial court also heard from Appellant's mother, Ms. Harris, who relayed that Appellant had a difficult childhood, untreated mental health issues, and a good character. *Id.* at 18-23.

Appellant addressed the court next, stating that he "accept[ed] the part I played in" the shooting. *Id.* at 23. However, Appellant reiterated that he shot Smith in self-defense. *Id.* at 24-25. Appellant stated, "It is not like I shot [Smith] first. If he never shot me, I could never shoot, because I never had a gun to shoot him with." *Id.* at 25.

The trial court then detailed Appellant's criminal history:

[I]n 2004, [Appellant] was charged as a juvenile with resisting arrest and disorderly conduct. …

* * *

[] [Appellant] was adjudicated delinquent [of resisting arrest and disorderly conduct] and received probation at that time. In 2006, [Appellant] was charged with criminal conspiracy, simple assault, and [recklessly endangering another person]. Again, a crime of violence against someone else. …

And then 2006, [Appellant] was adjudicated delinquency [*sic*] of criminal conspiracy and simple assault; and received a term of probation.

Subsequently, on … [July 26,] 2006, [Appellant] was charged with terroristic threats; and that was withdrawn.

Then on December 1 of 2009, [Appellant] was charged with aggravated assault, robbery, and [v]iolation of [the] Uniform Firearms Act, which indicated that he was charged with having a gun. [Appellant] was found not guilty of those charges.

On [August 25,] 2010, [Appellant] was charged with contraband, possession of a telecommunications device by an inmate; [Appellant] was found guilty of that while in prison. And [Appellant] was sentenced to six months [of] reporting probation.

On [May 14,] 2017, [Appellant] was charged with [the charges] … in the current case; for which he was found guilty after a trial by way of jury.

[Appellant] is also charged with, on February 25, 2021, aggravated assault, simple assault, resisting arrest, and those charges are pending, related to an altercation with police.

Maybe, to some people[] [Appellant] has been around, including his mother and all those neighbors [who wrote Appellant's character letters], he is not a bad person. …

And I don't know whether any member of [Appellant's] family was here when the video was played that showed [Appellant], after being pushed out of the house, [go] back up the steps, and [] shoot[] at [Smith] from behind, as [Smith] was trying to run into the house for safety, while [Appellant] was shooting him seven times.

And [Appellant] was shooting into an open door, knowing that there were children inside [the house]. And today, [Appellant] has expressed no remorse whatsoever for any of that.

*Id.* at 28-29; *see also id.* at 4 (trial court quoting PSI, which stated: "Based upon his criminal history, [Appellant] is at a high risk for incurring future offenses …."). The trial court opined that Appellant's pattern of criminal

behavior "is not something that just happened in 2017. It [ha]s been the way he has been living his life." *Id.* at 30.

Because the trial court was informed by a thorough PSI, "it will be presumed [the court] was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Conklin*, 275 A.3d 1087, 1098 (Pa. Super. 2022) (citation omitted). This Court has stated, "where the court has been so informed, its discretion should not be disturbed." *Commonwealth v. Ventura*, 975 A.2d 1128, 1135 (Pa. Super. 2009).

Our review confirms that the trial court considered the relevant sentencing factors, including mitigating circumstances, and properly explained its reasons for imposing Appellant's sentence. *See Commonwealth v. Macias*, 968 A.2d 773, 778 (Pa. Super. 2009) (stating appellate courts "cannot re-weigh sentencing factors and impose our judgment in the place of the sentencing court"). Notably, the sentencing court did not err by failing to give weight to Appellant's justification defense. *Commonwealth v. Reynolds*, 835 A.2d 720, 735 (Pa. Super. 2003) (stating where jury did not credit defendant's justification defense, "self-defense could not have reasonably been considered as a mitigating factor at sentencing."). As the trial court did not abuse its discretion, Appellant's sentencing issue does not merit relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/21/2023